UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IVOR HILL, | ) |
| | ) |
|     Plaintiff, | ) Case No. 14-cv-02098 |
| v. | ) |
| | ) Judge John W. Darrah |
| KOMATSU AMERICA CORP. | ) |
| and RODNEY SCHRADER, | ) |
| | ) |
|     Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Ivor Hill filed a Complaint for wrongful termination under the whistleblower provisions of the Sarbanes-Oxley Act of 2002 ("SOX") against Defendants Komatsu America Corp. ("KAC") and Rodney Schrader. Defendants filed a defense and counterclaim of breach of fiduciary duty against Hill. This Court has jurisdiction over Hill's claim pursuant to 28 U.S.C. §§ 1331, as the claim asserted in the Complaint presents a federal question under the Sarbanes-Oxley Act, 18 U.S.C. § 1514(A), and jurisdiction over KAC's counterclaim pursuant to 28 U.S.C. §1367(a). Defendants filed a Motion for Summary Judgment of both Plaintiff's claim and Defendants' counterclaim. For the reasons set forth below, the Motion is granted in part and denied in part.

### **LOCAL RULE 56.1**

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the party contends there is no genuine issue for trial." *Ammons v. Aramark Uniform Servs.*, 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id*. Local Rule

56.1(b)(3)(C) permits the nonmovant to submit "any additional facts that require the denial of summary judgment . . . ." To overcome summary judgment, "the nonmoving party must file a response to each numbered paragraph in the moving party's statement." *Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir. 2005). In the case of any disagreement, the nonmoving party must reference affidavits, parts of the record, and other materials that support his stance. *Id.* A nonmovant's "mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). If the nonmovant's response only provides extraneous or argumentative information, the response will fail to constitute a proper denial of the fact, and the fact will be admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005).

Legal conclusions or otherwise unsupported statements, including those that rely upon inadmissible hearsay, will be disregarded. *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). If the responding party fails to comply with Rule 56.1, its "additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted." *Gbur v. City of Harvey, Illinois*, 835 F. Supp. 2d 600, 666 (N.D. Ill. 2011). Substantial compliance is not enough; parties must strictly comply with the rule. *See Ammons*, 368 F.3d at 817.

**BACKGROUND**

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.

KAC is a foreign corporation doing business in Illinois with its principal place of business in Rolling Meadows. Komatsu is a subsidiary of Komatsu Ltd., a Japanese company, and is required to file reports under Section 15(d) of the Federal Securities and Exchange Act. (Ans. ¶¶ 2-3.) KAC is a leading manufacturer of trucks, earth-movers, and other heavy equipment with an annual revenue of approximately $20 billion. (Resp. SOF ¶¶ 8, 10.) Schrader replaced David Grzelak as CEO of KAC on April 1, 2012. (Resp. SOF ¶ 11.) Hill has been an employee at KAC since 2000, first as a regional manager, then promoted to Vice President of Utility in 2009, later to Vice President, General Manager of Service, and ultimately, to Vice President and General Manager of KAC's Mining Division on April 1, 2012. (Resp. SOF ¶¶ 2-4.) Due to his promotion to Vice President of the Mining Division, KAC paid for Hill to relocate from St. Charles to Peoria, Illinois in August, 2012. (Resp. PSAF ¶ 29.) KAC maintains a Travel and Entertainment Policy and Code of Conduct, which Hill received and reviewed, that govern employee conduct and detail which business-related expenses were appropriate for reimbursement and the approval process. (Resp. SOF ¶¶ 12-15.)

In March 2012, then-CEO Grzelak raised concerns about Hill's expenses from a trip to San Diego, California for a dealer strategy meeting to which his wife, Candice Komar accompanied him. Hill removed an improper expense from the report and resubmitted it for approval. (Resp. SOF ¶¶ 17-19.) In February 2012, KAC CFO Gary Kasbeer was shocked to see Hill's wife at a global management meeting in Dusseldorf, Germany. After confirming Hill did not seek prior approval from Grzelak to bring Komar, Kasbeer conducted an initial review of a sample of Hill's expense reports. (Resp. SOF ¶ 20.) A sample of 28 of Hill's expense reports were reviewed by Kasbeer. In an email to Hill, Kasbeer noted that 80 percent of the reports

3

contained only credit card statements or fragments of receipts and requested Hill resubmit them all properly in order for the audit to continue. (Resp. SOF ¶ 21.) On April 16, 2012, Hill emailed Kasbeer to "check on the expense situation" and to see if he had talked to Grzelak about the matter. Kasbeer responded that he had not "gone through the reports yet nor have I had any discussions with Dave [Grzelak]." (Resp. SOF ¶ 22.) Kasbeer then referred the investigation into Hill's expense reports to KAC's Compliance Committee ("Committee"), which consisted of KAC General Counsel and Secretary Edmund Bathelt, Controller Jim French, and Vice President of Human Resources Brad Perlstein. (Resp. SOF ¶ 23.)

Near the end of the investigation, Bathelt sent an email on September 12, 2012, to the other Committee members, recommending that an attached draft letter be sent to Hill detailing the compliance violations identified, requiring him to reimburse KAC, indicating that his expenses would be reviewed quarterly for compliance, and stating that any further violation of KAC's policies would result in termination. (Resp. PSAF ¶ 36.) This was not the conclusion of the investigation. The Committee did ultimately conclude that Hill had repeatedly violated KAC's policies by submitting personal expenses for reimbursement, traveling on company business with his spouse without prior approval, and submitting insufficient documentation to support his expenses. (Resp. SOF ¶ 30.) These violations occurred on a series of trips over a six month span between September 2011 and February 2012. (Resp. SOF ¶¶ 31-60.) In September 2012, the Committee met to discuss how to proceed in light of Hill's misconduct. The Committee reported their findings to Schrader and KAC's President and COO Noboru Sato and did not advocate any specific course of action. (Resp. SOF ¶ 62.) On October 4, 2012, Schrader informed Hill of the Committee's findings and terminated his employment. (Resp. SOF ¶ 63.)

KAC previously identified two other executives in recent years (a director and a vice president) that were terminated after KAC discovered that they submitted improper expenses to KAC for reimbursement[1]. (Resp. SOF ¶ 64.)

KAC has a Repair and Maintenance Program ("RAMP") to provide repair and maintenance over a certain period of time and at a specified cost to distributors and end-user customers of KAC products (vehicles or equipment). (Resp. SOF ¶ 65.) KAC accrues a portion of the value of each deal to cover future expected liability, which is based on engineering data and real world input from distributors about the component parts and labor costs associated with normal repair. (Resp. SOF ¶ 66.) KAC Information Reliability and Durability ("KIRD") Software and KAC's R & M Care Software are used to calculate the expected cost per hour for each component. (Resp. SOF ¶ 66.) At the time of Hill's termination, the RAMP reserves were at approximately $10 million, and Diego Chanto and Bob Reese were responsible for making sure the RAMP reserves were sufficiently funded. (Resp. SOF ¶¶ 67-68.) "[KAC's] SEC filings explicitly identified the risks associated with its various warranty and repair programs (including RAMP)." (Resp. SOF ¶ 71.) Hill was not involved in setting, reviewing or auditing the RAMP fund levels. (Resp. SOF ¶ 72.)

In August 2012, Hill had conversations with Reese and Chanto, respectively, and each told him the RAMP fund levels were low. (Resp. SOF ¶ 74.) Reese said Schrader had been ignoring the issue for years. (Resp. PSAF ¶ 31.) Without reviewing any documentation, raw

---

[1] Plaintiff does not dispute this fact; however, he objects to this statement as a fact not material to the outcome of Defendants' motion. Plaintiff notes that Defendants did not provide evidence showing that the conduct of the employees referenced was sufficiently analogous to the circumstances of this case.

data or other supporting material, Hill raised the concern with Schrader and recommended putting the issue on the risk and opportunity slide at the next board meeting. (Resp. SOF ¶ 75.) Schrader responded that Hill should forget about what Chanto and Reese said and that they were too conservative. After Hill's termination over a month later, he made a rough estimate based on his limited knowledge that the RAMP reserves should have been at roughly $200 million so that KAC could cover a worse-case-scenario situation where the entire population of trucks all "decided to go" at the same time. (Resp. SOF ¶ 76.) Hill did not give any indication to Schrader that the low RAMP reserves might be having a negative effect on investors or that securities or shareholder fraud was occurring. Hill did not review any of KAC's SEC filings and, when asked later to set forth the basis for his belief that KAC committed securities fraud, did not mention the effect that the alleged understated RAMP reserves had on investors. (Resp. SOF ¶¶ 77-78.) At no point during the investigation into Hill's expense reports was any member of the Committee informed of the alleged complaint or concern raised with Schrader regarding the RAMP reserves. (Resp. SOF ¶ 29.)

Throughout the relevant period, KPMG regularly audited KAC's liabilities, including the RAMP reserves, and issued clean audit letters to Komatsu validating the amount of those liabilities. In March 2013, KAC informed KPMG that Hill had made a complaint to the Department of Labor, alleging that he was terminated for reporting to Schrader that the RAMP accrual was short. In response, KPMG performed various audit procedures over the RAMP accrual balance to assess the adequacy of the accrual. KPMG found that KAC's key controls over the RAMP accrual were operating effectively, that management's estimates of new RAMP accruals were reasonable based on historical performance, that actual settlement amounts at the

expiration of RAMP contracts were in line with what was estimated and reserved by KAC, that all customers were included on the RAMP accrual analysis performed by management, and that no additional procedures were required to be performed for KPMG to release its opinion letter[2]. (Resp. SOF ¶ 70.)

Shortly after Hill's termination in October 2012, he filed this lawsuit against Defendants.

## LEGAL STANDARD

Summary judgment should be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issues as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party is responsible for informing the Court of what in the record or affidavits demonstrates the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the nonmoving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there is still a genuine issue of material fact. *Celotex*, 477 U.S. at 322–27; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252.

---

[2] Hill objects to a large portion of Resp. SOF ¶ 70 because KAC did not provide a supporting citation. However, the text of Resp. SOF ¶ 70 is supported by the exhibit cited after the first sentence of that paragraph. (Dkt. 29 Exh. 11.)

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Anderson*, 411 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 411 U.S. at 249-250.

## ANALYSIS

*Plaintiff's Sarbanes-Oxley Act Claim*

The Sarbanes-Oxley Act protects whistleblowers from retaliation by prohibiting employers from "discharge[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] against an employee in the terms and conditions of employment." 18 U.S.C. § 1514A. This protection extends to employees who lawfully act "to provide information, cause information to be provided, or assist[] an investigation regarding any conduct which the employee reasonably believes constitutes mail fraud, bank fraud, securities fraud, or a violation of any rule or regulation of the SEC, or any federal law relating to fraud against shareholders," so long as the assistance is provided to a person with investigatory authority. *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009) (citing 18 U.S.C. § 1514A(a)). In order to prevail on a SOX whistleblower claim, an employee must meet the legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b), which require the employee to:

8

> [P]rove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.

*Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(iii) and citing *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008)). If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." *Id.* (citing *Allen*, 514 F.3d at 475-76). The employee must also have a subjective belief that the conduct he is reporting violates a listed law and that belief must be objectively reasonable. *Id. See also Day v. Staples*, 555 F.3d 42, 54 (1st Cir. 2009); *Allen*, 514 F.3d at 477; *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008). This standard is evaluated "based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (citing *Allen*, 514 F.3d at 477).

Defendants contend that Hill is only able to establish one element of his *prima facie* case: that he was subject to an adverse employment action when his employment was terminated. Defendants argue that Hill cannot establish that he engaged in protected activity, that Defendants knew Hill engaged in protected activity, or that the alleged protected activity was a contributing factor to his employment termination.

*Protected Activity*

Whistleblowers receive protection under § 1514A of SOX if they aid in the investigation of conduct which might be a violation of one of six enumerated categories of federal law: "[18 U.S.C. §§] 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud

9

against shareholders." 18 U.S.C. § 1514A(a)(1).  Hill asserts that Defendants' actions regarding the RAMP program were in violation of 18 U.S.C. § 1348, securities fraud.  (Compl. ¶¶ 35, 43.)

Hill's claim rests on a theory of securities fraud and must offer evidence to show the basic elements of a securities fraud claim:  "(1) a material misrepresentation (or omission); (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  While Hill does not need to prove actual harm, he must at least have a subjectively and objectively reasonable belief that "the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss."  *Day*, 555 F.3d at 56; *see, e.g., Fraser v. Fiduciary Trust Co. Int'l*, 417 F.Supp.2d 310, 322 (S.D.N.Y. 2006) ("While a plaintiff need not show an actual violation of law, or cite a code section he believes was violated, 'general inquiries' . . . do not constitute protected activity.") (alteration in original) (citations omitted).

Defendants first argue that Hill's belief that a material misstatement was made to KAC's investors regarding the alleged underfunding of the RAMP reserves was neither subjectively nor objectively reasonable.  Defendants argue there is a distinction between a subjectively reasonable concern that the RAMP reserves are low and a belief that a company is committing securities fraud.  Hill expressed to Schrader that there was a concern that the RAMP fund was underfunded and suggested putting it on the board meeting agenda so that the concern could be evaluated.  (Resp. SOF ¶ 75.)  Hill acknowledges that he had at best, a limited working knowledge of the reserves.  (Resp. SOF ¶ 76.)  He argues that as a high-level executive, he understood how intentionally understating liabilities on consolidated financial statements was fraud to

10

shareholders. (Resp. SOF ¶ 77.) But Defendants correctly note that Hill did not alert Schrader to the fact that he was concerned about potential securities fraud - in fact, Hill did not even assert that the RAMP reserve levels were definitely too low, but rather that it was a concern that might be worth looking into. (Resp. SOF ¶ 75.)

Even if Hill could establish that his belief that securities fraud was being committed was subjectively reasonable, he provides no substantial evidence that it was objectively reasonable. Defendants point out that the RAMP reserves are calculated based on engineering data and real world feedback about the durability of specific truck components. (Resp. SOF ¶ 66.) Based on his own calculations, Hill believed that because 20 percent of KAC's 2,500 sold vehicles were under a RAMP contract and it could cost as much at $500,000 to maintain a truck over its lifespan, that the fund should have had $200 million in reserves to account for a worse-case scenario (discounted $50 million because it is not necessary to completely rebuild each truck). (Resp. SOF ¶ 76.) Even if this calculation, done without software or real world data from distributors, was sufficient to support an objectively reasonable belief that securities fraud was taking place, Hill does not establish through the record that he informed Schrader of these figures before his termination.

Additionally, Defendants argue that even if Hill is correct regarding the allegedly low levels of RAMP reserves, the shortfall is insignificant compared to the overall revenue of the

company and would not be a material misrepresentation[3]. Courts in several circuits have held that a SOX retaliation claim fails when the allegedly improper activity is too trivial to constitute fraud. *See Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014); *Day*, 555 F.3d at 57 ("Day's belief was also objectively unreasonable because he has made no showing that any inaccuracy was material to shareholders."); *Beacom v. Oracle Am.,* 2015 LEXIS 66599, at *12 (D. Minn. Mar. 11, 2015) (holding that an alleged misrepresentation of $3.5 million for a company reporting $9.2 billion in revenue "is not material and cannot constitute fraud"). Even if the RAMP reserves should have been twenty times larger (Hill's $200 million figure), that would only be one percent of Komatsu's annual revenue.

Defendants point to *Platone v. U.S. Dep't of Labor*, where the Fourth Circuit held that a complainant must alert management to more than a problem or discrepancy with the company's finances, in order to establish fraud. 548 F.3d 322, 327 (4th Cir. 2008). Hill's sole discussion about the RAMP reserves with Schrader did not include any expression of concern that fraud was occurring; the record does not indicate Hill's calculation of what the reserves should be occurred prior to his termination, and he does not claim that he reviewed SEC filings for KAC because of his concerns. All evidence to support the argument that his concern was objectively reasonable occurs after employment and thus, his actions are not protected.

---

[3] Defendants note that even if KAC's RAMP reserves were so short that the amount needed to be doubled, even a full $10 million adjustment (the approximate amount of the RAMP reserves during the relevant period) to Komatsu Ltd.'s revenue would be .05 percent of its annual revenue of $20 billion. Any reasonable individual can recognize that such a shortfall would be insignificant when compared to the entirety of the reporting entity. *See, e.g., Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014).

Finally, Hill contends that Schrader's intent to deceive investors is evidenced by his unwillingness to put the RAMP reserve numbers on the board meeting agenda and the statements made by Reese that Schrader ignored the problem year after year. The fact that Schrader declined to address Hill's concern regarding the reserve levels is insufficient to establish a reasonable belief that Schrader intended to defraud investors, especially because Hill did not raise securities fraud or shareholder fraud as a concern at the time.

*Knowledge of Protected Activity*

Defendants next contend that Hill cannot establish that KAC knew of his alleged protected activity. Specifically, Defendants argue that Hill never reported that anyone at KAC was communicating false information to shareholders and that Hill's decision to report his concern to Schrader constitutes nothing more than a raising of a general business concern. (Def's SOF ¶ 75.) In response, Hill correctly points out that an employee need not identify a specific code or law that was violated in order to alert his employer of the potential fraud and, by extension, his protected activity.

As Vice President of the Mining Division, Hill could be expected to raise concerns related to the company's operations and liabilities like the RAMP reserves with other company executives and the board. Hill testified that he conveyed Reese's and Chanto's concerns to Schrader, who dismissed them. This alone would not alert Schrader to the fact that Hill's complaint was regarding protected activity because he was not alleging that securities fraud or shareholder fraud was taking place. (PSF ¶¶ 30-33.) Hill provides insufficient evidence to establish that Schrader understood or should have understood his expressions of concern as a

13

report of potentially illegal activity. Hill has not provided substantial evidence that KAC might have known Hill was engaging in protected activity.

*Contributing Factor to Adverse Employment Action*

Defendants argue that while Hill did suffer an adverse employment action because he was terminated, he cannot establish that the protected activity was a contributing factor to his termination. Hill testified months after his termination that his reporting of the RAMP issue to Schrader "could be, indeed, the reason for action against me." (Def.'s SOF ¶ 80.) Defendants argue this is extremely speculative, and nothing in the record supports Hill's claim that his termination was retaliatory. Defendants also argue that Hill's termination is "credibly explained by a non-retaliatory motive" and that they would have taken the same adverse action in the absence of Hill's alleged protected activity. 29 C.F.R. § 1980.104(e)(4); *see Taylor v. Wells Fargo*, 2005 WL 6478690, at *12-13 (ALJ Feb. 14, 2005), *aff'd*, 2007 WL 7143176 (ARB June 28, 2007).

Hill responds that there is ample evidence to establish that his protected activity was a contributing factor in his determination. He notes that the standard for establishing his protected activity was a contributing factor to his termination is more lenient than other causation standards. *Wiest v. Lynch*, 15 F. Supp. 3d 543, 562 (E.D. Pa. 2014). A contributing factor is one that can, alone or in combination with other factors, affect the outcome of a decision. *Id.* (citing *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB No. 04 - 149, 2006 WL 3246904, at *13 (Dep't of Labor May 31, 2006); *accord Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1136 (10th Cir. 2013). A plaintiff need only establish "an inference of causation," and temporal proximity is relevant in the drawing of such inferences. *Zinn v.*

14

*Am. Commercial Lines Inc.*, ARB No. 10 - 029, 2012 WL 1143309, at *6 (Dep't of Labor Mar. 28, 2012). In drawing such inferences, "the closer the temporal proximity, the greater the causal connection there is to the alleged retaliation; this indirect or circumstantial evidence can establish causation in a whistleblower retaliation case." *Id.*; *accord Lockheed Martin*, 717 F.3d at 1137.

Hill raises three points in support of the inference that Hill's complaint regarding the RAMP reserve levels contributed to his termination. First, Hill contends that his company paid for his move from St. Charles to Peoria in conjunction with his promotion. This occurred about three months after the Committee began their review and about one month after he was specifically questioned about the expense reports by Bathelt and French. (PSAF ¶¶ 3, 29.) Hill argues that this indicates that prior to his RAMP reserve complaint, KAC had no intention of terminating his employment. Defendants respond by pointing out that his promotion to Vice President of the Mining Division occurred on April 1, 2012 and it was not until several weeks later that the expense investigation was referred to the Committee. (Resp. SOF ¶¶ 4, 23.) Hill relocated in August, around the time he lodged his complaint with Schrader regarding the RAMP reserves. Hill contends that the company's decision to go through with the relocation indicates KAC had no intention to fire him until he made a complaint. However, Hill acknowledges that he spoke with Schrader in late August and was terminated over a month later, on October 4, 2012. (Resp. SOF ¶¶ 63, 75.) Additionally, at the time of the move in August, the Committee had not yet made any formal recommendation to Schrader and Sato or concluded their investigation.

15

Second, Hill contends that the Committee concluded that he should pay back some expenses and not be terminated and that this decision is memorialized in a September 12, 2012 email. A draft letter to Hill was attached to the email, stating that further violations of KAC policy could result in termination. (Pls. SOF ¶¶ 36-37, 39.) Hill claims that this correspondence between the members of the Committee shows that termination was not initially a possibility and indicates there was never an intention to fire him prior to his RAMP reserve complaint. The letter Hill relies on was a draft, which Schrader never saw, and Perlstein testified his response to the email containing the draft letter, did not indicate agreement with the letter's contents. (Resp. PSAF ¶¶ 37.) However, the final version of the letter ultimately provided to Schrader and Sato was devoid of any specific recommendation regarding the action to be taken. (Resp. PSAF ¶¶ 38-39.) The final letter is consistent with the testimony of the Committee members that they wanted to give management the full range of options, which included termination.

Finally, Hill argues that Schrader, alone, made the decision to fire him and did so shortly after the RAMP reserve complaint. Hill also alleges that the Compliance Committee members' current assertions that they agreed with Schrader's decision contradict their documented recommendations. (PSAF ¶¶ 36-40.) However, Hill acknowledges that COO Sato was present with Schrader to receive the Committee's findings and that the Committee members did not advocate for any specific consequences. (PSAF ¶ 38.) Sato was at the meeting with Schrader and the Committee members and was present when the decision was made to pursue termination. (Resp. PSAF ¶ 40.)

Hill has not established a sufficient inference of causation to support his argument that his RAMP reserve complaint was a contributing factor in his termination. Over a month passed

16

between his complaint and his date of termination. The Committee spent months investigating his expense reports and while some members may have favored recommending something other than termination at some point during the investigation, the ultimate Committee recommendation left the decision to upper management. The facts do not indicate that the Committee was aware of the RAMP reserve complaint or that they changed their mind after learning of it and before making a final recommendation. While Hill alleges that Schrader made the decision to terminate him, it is clear that he made the decision after discussing it with the three Committee members and COO Sato, who then gave final approval.

*Affirmative Defense: Dismissal Regardless of Protected Activity*

Defendants' final argument in favor of their Motion is that even if Hill has established his *prima facie* case under SOX, he cannot prevail because there is clear and convincing evidence he would have been terminated in the absence of his alleged protected activity. The Department of Labor has set out procedures for handling retaliation complaints under Section 806 of SOX:

> (4) Notwithstanding a finding that a complainant has made a prima facie showing, as required by this section, further investigation of the complaint will not be conducted if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of the complainant's protected activity.

29 C.F.R. § 1980.104(e)(4). Over a six month period from September 2011 to February 2012, Hill took a series of trips and submitted expenses for reimbursement in violation of KAC's Travel and Entertainment Policy and Code of Conduct. These violations are undisputed by Hill. (Resp. SOF ¶¶ 31-60, 63.) KAC's investigation into Hill's behavior coupled with Hill's own admission of fault is sufficient to establish that even if Hill could state a claim under SOX, there is clear and convincing evidence his employment would have been terminated in the absence of the alleged protected activity.

17

*Defendants' Breach of Fiduciary Duty Counterclaim*

In response to Hill's retaliation claim under SOX, Defendants brought a state law counterclaim against Hill for breach of fiduciary duty. Whether to retain supplemental jurisdiction over state law claims is a question that remains "at every stage of the litigation." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotations omitted). The question here is whether the Court should exercise its discretion under § 1367(c) to relinquish jurisdiction over the state law claims. Section 1367(c) provides that a district court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). Defendants' motion for summary judgment of Plaintiff's SOX claim is granted; therefore, Defendants' state law claim is dismissed for lack of jurisdiction. *Kolbe & Kolbe Health & Welfare Benefit Plan v. Medical College of Wisconsin, Inc.*, 657 F.3d 496, 505 (7th Cir.2011) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.") (citation omitted).

## CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment [27] is granted as to Plaintiff's claim, and denied as to Defendants' counterclaim. Defendants' counterclaim is dismissed without prejudice for lack of supplemental jurisdiction with leave to file in state court.

Date: August 26, 2015

_____
JOHN W. DARRAH
United States District Court Judge